UNITED STATES v. WALSH et al.

(Circuit Court of Appeals, Second Circuit. April 16, 1902.)

No. 120.

1. CONTRACT FOR CONSTRUCTION OF GOVERNMENT WORK — CONSTRUCTION — WAIVER OF BREACH BY OFFICERS.

A contract for the construction of a dry dock for the United States required such construction to conform in all respects to the plans and specifications which were attached and made a part of the contract, and provided that such plans and specifications should not be changed in any respect except upon a written order of the bureau of yards and docks, and by written agreement between the parties. It further provided that the government should have a competent civil engineer in charge of the work, who should have the privilege of inspecting at all times the materials and work, with power to reject either materials or work deemed by him unsuitable or not in conformity with the contract or plans and specifications. ·Held, that such engineer could not bind the United States by consenting to deviations from specific requirements of the specifications as to workmanship or materials, which fact the contractors were bound to know, and that no action or neglect of his or his subordinates could operate as a waiver or estoppel on the part of the government to relieve the contractors from liability for such de-·partures from the requirements of the contract.

2. SAME—EFFECT OF ACCEPTANCE—IGNORANCE OF DEFECTS.

The contract further provided that the contractors should not be entitled to full and final payment until the dock had been tested by officers designated by the government, and accepted after their approval. ·Held, that an acceptance and payment of the contractors after such test did not conclude the government if made in ignorance of facts which, if known, would have led to a refusal to accept, and that, where the final test was made under conditions which did not permit structural departures from the specifications to be discovered by the officers making it, the government was not chargeable with notice of such defects, to preclude it from holding the contractors liable therefor on their sub-·sequent discovery, because of the knowledge of or consent to the same by its engineers in charge of the work, who, as the contractors were bound to know, had no authority in the premises.[1]

8. SAME.

The acceptance by the engineer, or his acquiescence as the work proceeded, and the final acceptance of the dock by the board of officers designated by the navy department, are important evidential facts tending to prove that the work and materials complied with the contract; but they are not of controlling effect, and neither such acceptance nor the payment of the contract price necessarily deprives the government of its right of action for a breach of the contract in material and substantial particulars.

4. SAME—DISCHARGE OF SURETY—MODIFICATION OF PLANS.

A surety for the performance by the contractor of a building contract, which provides that changes may be made in the plans and specifications by written agreement of the parties, is not discharged from liability by modifications so agreed upon which are not so extensive as to·radically change the contract and substitute a different one.

In Error to the Circuit Court of the United States for the Southern District of New York.

Henry L. Burnett, Arthur M. King, and George H. Gorman, for the ·United States.

Howard A. Taylor and James A. Soley, for defendants in error.

Before WALLACE and TOWNSEND, Circuit Judges.

[1] See Contracts, vol. 11, Cent. Dig. §§ 1464, 1467, 1468, 1469, 1473, 1474.

WALLACE, Circuit Judge. This is a writ of error by the plaintiff in the court below to review a judgment for the defendants entered upon a verdict rendered by the direction of the court. 108 Fed. 502.

The action was brought to recover damages sustained by the United States for a breach of a contract for the construction of a dry dock at the navy yard, Brooklyn, N. Y., made May 8, 1895, to which contract the defendants Thomas and Augustin Walsh, as principals (named therein as "contractor"), and the defendant Crimmins, as surety, were parties of the first part, and the bureau of yards and docks, United States navy department, representing the government, was the party of the second part. The important clauses of the contract which concern the liability of the defendants are these:

"First. The contractor will * * * construct and complete, ready to receive vessels, a timber dry dock, to be located at such place on the water line of the navy yard, Brooklyn, N. Y., as shall be designated by the party of the second part; and will at his own risk and expense furnish and provide all labor, materials, tools, implements, and appliances of every description necessary or requisite in or about the construction of said dry dock and the steel caisson, pumping machinery, pump house, culverts, and all other accessories and appurtenances, in accordance with the aforesaid plans and specifications, subject to the approval of the civil engineer, or such other competent officer or person or persons as may for that purpose be designated by the party of the second part. It being further mutually stipulated and agreed that the officer or officers, person or persons, thus designated, shall and may, from time to time during the progress of the work, inspect all materials furnished and all work done under this contract, with full power to reject any material or work, in whole or in part, which he or they may deem unsuitable for the purpose or purposes intended, or not in strict conformity with the spirit and intent of this contract and with the aforesaid plans and specifications, and to cause any inferior or unsafe work to be taken down by and at the expense of the contractor; and that all such rejected material shall be at once removed from the station, and replaced by material satisfactory to such inspector; and that all such inferior or unsafe work shall be replaced by satisfactory work by and at the expense of the contractor. Such inspectors shall at all times during the progress of the work have full access thereto, and the contractor shall furnish them with full facilities for the inspection and superintendence of the same."

"Seventh. The construction of the said dry dock and its accessories and appurtenances herein contracted for shall conform in all respects to and with the plans and specifications aforesaid, which plans and specifications are hereto annexed, and shall be deemed and taken as forming a part of the contract with the like operation and effect as if the same were incorporated herein. No omission in the plans or specification of any detail, object, or provision necessary to carry this contract into full and complete effect in accordance with the true intent and meaning hereof shall operate to the disadvantage of the United States, but the same shall be satisfactorily supplied, performed, and observed by the contractor, and all claims for extra compensation by reason of or for or on account of such extra performance are hereby, and in consideration of the premises, expressly waived; and it is hereby further provided, and this contract is upon the express conditions, that the said plans and specifications shall not be changed in any respect, except upon the written order of the bureau of yards and docks; and that if at any time it shall be found advantageous or necessary to make any change, alteration, or modification in the aforesaid plans and specifications, such change, alteration, or modification must be agreed upon in writing by the parties to the contract, the agreement to set forth fully the reasons for such change, and the nature thereof, and the increased or diminished compensation, based upon the estimated actual cost thereof, which the contractor shall receive.

"Eighth. The aforesaid dry dock and its accessories and appurtenances, and each and every part thereof, shall be constructed of approved materials, and in a thoroughly substantial and workmanlike manner, in accordance with the true intent, meaning, and spirit of the contract, plans, and specifications, to the satisfaction of the party of the second part."

"Tenth. It is mutually understood, covenanted, and agreed by and between the parties hereto that the said dry dock shall not be accepted, and that the contractor shall not be entitled to the final payment or to reservations previously made, until twenty days after a complete test of said dock shall have been had under the direction of such officers as may be designated by the party of the second part, such test to consist of a full duty test of the pumping machinery, and the docking of such vessel as the party of the second part may direct; the emptying of the dock, the refilling of the dock, and the removal of such vessel, without any indications whatever of any defect, weakness, or settlement due to faulty material or workmanship in said dock, or either of its accessories, and the result of such test to be in all respects to the full and complete satisfaction and approval of the officers designated to superintend the same. Such test shall be made within thirty days after the contractor shall have notified the party of the second part of the completion of the dock, and a decision upon the question of acceptance made within twenty days thereafter."

"Twelfth. (6) When all the conditions, covenants, and provisions of this contract shall have been performed and fulfilled by and on the part of the contractor, he shall be entitled, within ten days after the filing and acceptance of his claim, to receive the said reserve, and any sums not covered by the monthly estimates, or so much thereof as he may be entitled to, on the execution of a final release to the United States, in such form as shall be approved by the chief of the bureau of yards and docks, of all claims of any kind or description under or by virtue of this contract."

Other provisions of the contract, which are read into it because contained in the specifications, are as follows:

"Superintendence. The contractor shall at all times during the construction of the dock have competent engineers and superintendents in charge of all parts of the work. The government will have also a competent civil engineer in charge of the construction of the dock. The contractor will, at all times when called upon by the civil engineer in charge of construction, furnish him full facilities for inspecting workmanship and material, and will furnish him also a daily statement of material received for the work, so that said material may be inspected by him and accounted for. The contractor will also make daily report to the engineer in charge of the work of the amount of material worked, excavation removed," etc.

"Test. After the dock structure has been completed in all its parts, connection made with the pumps, the drainage pump put in place, entrance way cleared, etc., the dock structure shall be tested by having one of the largest and heaviest vessels of the government placed in it. Should any weakness or defect become apparent during such trial test, due to defective or improper materials or workmanship, the weakness or defects shall be made good by the contractors before final settlement and release from the contract."

The complaint alleges that the work, labor, and services performed and material furnished by the contractors in constructing the dock were not in accordance with the terms of the contract, and departed from the requirements of the specifications in various particulars, and in consequence it became necessary for the government to expend the sum of $171,360 in order to put the dock in proper condition for use.

Upon the trial it appeared that the contractors entered into the work of constructing the dock in May, 1895, and prosecuted it until February, 1897, when they notified the bureau of yards and docks that it was ready to be tested. Throughout the progress of the work it was

under the supervision of the engineer in charge, or his subordinates, upon the part of the navy department. They frequently required the contractors to make changes in method and in detail of performance to conform to their views; and their observation was so constant as to have enabled them, if they had so desired, to discover at the time any material departure which the contractors could have made from the specifications. Upon receiving the contractor's notice that the dock was ready for testing it was examined by a board of officers designated by the navy department, and the board reported it to conform "in all respects with the requirements of the contract, plans, and specifications," with certain exceptions, which were pointed out, and recommended that it be accepted by the government upon compliance by the contractors with the requirements mentioned in their report. The contractors made compliance, and in April, 1897, the bureau of yards and docks notified them of its acceptance of the dry dock, and instructed them that upon execution of the release provided for by the contract they would be paid the amount due under the contract. They executed the release, and were paid in full. In the following month a leak in the dry dock was discovered, which led to an examination of the structure by a board of engineers appointed by the navy department. The leak originated in that part of the structure known as the "table end" of the dock. Evidence was offered upon the trial tending to show deviations in construction from the plans and specifications in various important particulars at that part of the structure, and of a character sufficient to account for the leak. The principal deviations consisted in an improper alignment of the piles, in the omission to use piles of the length required, in the improper driving of the piles, in not having them in contact either with the cross-caps or the ends of the decking, in not bolting them to the cross-caps, in so fitting the floors to the sheet piling that openings extended between the floors and piling in places of a width of 12 or 13 inches, and in insufficiently calking the floors. The evidence tended to show that, where piles were required by the specifications to be 47 feet long, some were only 12 feet, some 16 feet, and some 18 feet long, and that dummy piles were used in places. In September, 1897, the government entered upon the work of repairing the dock, and subsequently expended in putting it in proper condition the sum of $171,360.

It further appeared upon the trial that at the time the examination was made in March, 1897, and the dock tested by the board of officers appointed by the navy department, the caisson was in place, and the table end was about 27 feet below the surface of the water, and that there was a cement floor over the bottom, and the evidence was such as to permit the inference that the surrounding conditions were sufficient to account for their failure to discover the deviations and defects in construction.

The trial judge, upon the motion of the defendants, directed a verdict in their favor. He placed his ruling upon the ground that the testimony did not warrant the conclusion that there was not knowledge on the part of the government, through its officers, of the deviations from the contract; that the government was charged with such knowledge at the time of its final acceptance of the dock; and that the

plaintiffs were not entitled to recover after such acceptance. The principal assignment of error is based upon this ruling.

In view of the undisputed facts, and the facts which the jury would have been authorized to find upon the evidence, the government was entitled to recover the damages sustained by the breach of the contract, unless what took place during the progress of the work was a waiver of more complete performance, or unless the cause of action did not survive the acceptance of the dock and the final payment made by the government. The first inquiry is whether the engineer in charge of the work had any authority to sanction or permit the deviations from the specifications made by the contractors during the progress of construction. The contractors undertook to construct a dry dock according to the plans and specifications. The contract provided that the construction should conform in all respects to the specifications, and that there should be no change or modification of the specifications in any respect except upon the written order of the bureau of yards and docks. The authority of the engineer in charge was only that conferred by the contract, and the contractors were informed by the instrument under which he exercised his authority of its extent and limitations. If he had expressly consented to an unauthorized performance, his acts would not have bound the government. Much less is the government bound if he consented to an improper performance of the contract by neglect or mistake. He had no power to authorize a departure from the requirements of the specifications, unless it was delegated by that clause which provides that the work is to be subject to his approval and inspection, and permits him to reject any materials or work which he may deem unsuitable. That provision was one for the benefit of the government. It is to be construed as an additional safeguard against noncompliance with the specifications by the contractors, and against a literal but unsatisfactory compliance. An instructive authority in point is Glaucius v. Black, 50 N. Y. 145, 10 Am. Rep. 449. That was a case where, by the terms of a contract for the repair of a building, it was stipulated that the material should be of the best quality, and the work performed in the best manner, subject to the acceptance or rejection of an architect, all to be done in strict accordance with the plans and specifications, and to be paid for when done completely and accepted; and it was held that the acceptance by the architect of a different class of work, or of inferior materials, did not bind the owner, and did not relieve the contractor from the agreement to perform according to the plans and specifications. See, also, Woodruff v. Railroad Co., 108 N. Y. 39, 14 N. E. 832. Undoubtedly the contract made the engineer in charge the appointee of both parties, and contemplated that his decision should be final in respect to all details of performance which were left to his decision by the specifications; and the promise of the government to "have a competent civil engineer" always in charge emphasizes this interpretation. Under a contract containing similar provisions, but where the specifications provided that certain sandstone to be used in the dock should be of a "quality approved by the engineer," it was held in U. S. v. Barlow (Sup. Ct., Feb. 24, 1902) 22 Sup. Ct. 468, 46 L. Ed. ——, that the engineer's decision, when properly exercised, was final as to

the quality of the sandstone, and that the contractor was entitled to recover for sandstone delivered, inspected, and approved by the engineer, notwithstanding it had been subsequently rejected by the government.

The departures from the specifications in the present case were not in any matters of performance which were left to the discretion of the engineer. They were deviations from specific requirements of the specifications. As the contract did not authorize the engineer or his subordinates to permit any such departures from the specifications as would appear to have been made, and as the contractors were bound to know that it did not, what occurred during the progress of the work furnished no defense to the action either upon the ground of waiver or estoppel.

The acceptance of the dry dock after the final test did not conclude the government if it was made in ignorance of facts which, if known, would have led to a refusal to accept. The government did not contract that the acceptance should be conclusive evidence of the contractor's performance of the contract, or entitle them to be paid in full. It did contract that the contractors should not be paid in full without such acceptance. In this respect the contract is unlike some building contracts in which the parties agree that the certificate of an architect, or his acceptance of the work, shall be conclusive, and as to which it has been held that they cannot withdraw the decision of the question of compliance or noncompliance from the architect, and offer it to the decision of a court. Butler v. Tucker, 24 Wend. 447; Smith v. Brady, 17 N. Y. 176, 72 Am. Dec. 442; Railroad Co. v. Price, 138 U. S. 185, 11 Sup. Ct. 290, 34 L. Ed. 917; Kennedy v. Poor, 151 Pa. 472, 25 Atl. 119. The evidence in the case certainly warrants the conclusion that at the time of the acceptance the government ought to have been informed of the departures from the specifications made by the contractors by some of its officers who were in constant supervision, and had every opportunity to discover them during the progress of the work. The final test was made under conditions which did not permit them to be discovered by the exercise of ordinary expedients, and the evidence does not warrant even the inference that the government was actually aware of the deviations when the dock was accepted, or when the final payment was made to the contractors. Knowledge is not imputed to a principal of the unauthorized acts of his agent. A principal is never charged with the consequences of the misconduct of his agent in violating his instructions except for the protection of some third person who has been misled by reliance upon the ostensible authority of the agent; and his responsibility in such cases rests upon the ground of ratification or estoppel. The contractors had no right to suppose that the engineer in charge or his subordinates were authorized to permit the deviations; the government did not know that they had taken place; and the acceptance of the dock and the making of the final payment under these circumstances did not prejudice the right of the government upon the discovery of the truth to maintain its action for the breach of the contract.

Even if the government should have been aware that the contract had not been complied with when the dock was accepted and the final

payment made, it is not apparent that its right of action did not survive. In Briggs v. Hilton, 99 N. Y. 517, 3 N. E. 51, 52 Am. Rep. 63, where a sale was made with warranty of quality, the goods to be delivered at a time several months subsequent, it was held that a cause of action for a breach of the warranty survived the acceptance and retention of the goods by the purchaser, with ample opportunity to ascertain their defects and the payment of the purchase price. See, also, Story Sales, §§ 405, 406, and Benj. Sales, § 901. Payment of the contract price does not of itself constitute a waiver of the defects in the articles paid for, even though the party paying is at the time actually aware of the defects. Plannery v. Rohrmayer, 46 Conn. 558, 33 Am. Rep. 36; Moulton v. McOwen, 103 Mass. 587.

The owner of real property, who has employed another to erect a structure on his land, does not, by taking possession and appropriating the structure to the uses for which it was built, preclude himself from insisting that the builder has not properly performed his contract. The results cannot be separated from the necessary consequences of ownership; and as he cannot, without prejudice to himself, reject them or refuse to retain them, the law does not imply any promise from his acceptance of them. This being so, it matters not whether at the time he is or is not aware of the defects. Mohney v. Reed, 40 Mo. App. 99; Stewart v. Fulton, 31 Mo. 59. "Each material, as it is placed in the work, becomes annexed to the soil, and thereby the property of the owner. * * * As the erection is his by annexation to the soil, he may suffer it to stand, and there is no rule of law against his using it without prejudicing his rights." Smith v. Brady, 17 N. Y. 173, 189, 72 Am. Dec. 442. Acceptance without objection is evidence that the contract has been satisfactorily fulfilled, and, when there is an obligation to reject or accept, raises an implied promise from the reception of the benefits of the contract to pay for their value. This is the only effect of acceptance. If there is such an implied promise, performance of the original contract is waived, and it is treated as having been duly performed, or the recovery proceeds upon the new contract. It is true that slight deviations or unimportant omissions in the performance of a building contract will not defeat a recovery by the contractor, and, if he has substantially performed, he can recover what is justly due, making allowance for the value of the deviations; but this right of recovery is wholly independent of any act of acceptance by the owner.

The acceptance by the engineer, or his acquiescence as the work proceeded, and the final acceptance by the board of officers designated by the navy department, were important evidential facts tending to establish that the work and materials were supplied conformably to the contract. In other respects they were not of controlling effect. There was evidence which might have authorized the jury to find that in some particulars the departures were so serious that the contractors must have known at the time that they were likely to endanger the integrity of the structure. Without intending to intimate that the evidence was cogent enough to compel such a finding, it is sufficient to say that there was a question of fact for the jury, and that the case should not have been taken from them by the court.

It is insisted in behalf of one of the defendants in error, the surety for the contractors, that as to him the judgment should be affirmed, because he was released from his obligation by changes and modifications made in the requirements of the contract by supplemental contracts made between the contractors and the government during the construction of the dry dock.

The undertaking of the surety was entered into at the time of the execution of the contract, and was conditioned that the contractors should "well and truly perform the stipulations" of the contract. During the progress of construction various supplementary contracts were made between the bureau of yards and docks and the contractors in respect to additional work to be done upon or about the dry dock. Of these contracts three only are in question. The first one was made July 22, 1895. It provided that the contractors should be at liberty to deposit 5,000 to 8,000 cubic yards of clay (material excavated to make room for the dock structure) in front of the quay wall immediately in front of the dock entrance; that they should maintain in the channel of the Wallabout opposite the dock entrance the same depth of water as then existed until the completion of the dock; and that they should remove all the material deposited in front of the quay wall upon the completion of the dry dock. It further provided that no claims for compensation should be made by either party upon the other for the work thus to be done, and that "in default of the maintenance of the channel or the removal of the deposited material by the contractors" the bureau of yards and docks might maintain the channel and remove the material, and "deduct and withhold a sum equal to the entire cost thereof from any payment due or to become due" to the contractors for constructing the dry dock under the original contract.

June 12, 1896, the contractors and the bureau of yards and docks made a further contract. After reciting that the party of the second part deemed it necessary to make some modifications in the plans and specif ations attached to and forming a part of the original contract, and that the contractors had consented to such modifications, it provided for building "the quay wall and the approach to dry dock No. 3, and cutting off the point of the old quay wall," in accordance with plans and specifications attached, and for paying the contractors therefor the sum of $47,529, in monthly payments, reserving 10 per cent. until the completion of the work to the satisfaction of the engineer in charge.

August 29, 1896, the contractors and the bureau of yards and docks made a further contract. It recited that the party of the second part deemed it advantageous to the government that the original contract be modified so as to include "a timber superstructure for the track of the 40-ton locomotive crane," and it provided that for doing the additional work according to plans approved the contractors should be paid the additional sum of $27,821.

The surety was not a party to any of these supplemental contracts, and was not consulted in respect to them, but we are of the opinion that he consented in advance to the modifications which they introduced into the original contract. It was the meaning of the seventh

clause that if, at any time, it should be found advantageous or necessary to make any change, alteration, or modification in the plans and specifications, this could be done upon the written agreement of the parties to the contract. It is true that the provision requires the agreement to set forth fully the reasons for such change, and in two of the supplemental contracts the reasons were not set forth in detail, the recitals being merely that the changes were deemed to be advantageous for the government. This feature of the provision, however, was a mere formality, and a failure to comply with it did not affect the substantial rights of the parties. In the supplemental contract of July 22, 1895, the reasons for the change were stated in full. Except for the provision in clause 7, we do not doubt that the surety would have been discharged, because the undertaking as modified would have been no longer the one for which he originally became answerable. It is not contended that the modifications made in the original plans and specifications by the supplemental contracts were not advantageous. They were not so extensive as to substitute a new or radically different undertaking in the place of that originally contemplated, and, as it was provided that they might be made, the surety cannot complain.

The judgment is reversed.