## UNITED CONST. CO. v. HAVERHILL, N. H., et al.

Circuit Court of Appeals, Second Circuit.
November 1, 1927.

No. 21.

**1. Bridges ⟳20(4)—Breach of contract to excavate to solid ledge in constructing pier held not excused by towns' misrepresentation as to depth of ledge, where excavation did not extend to depth required.**

Failure of contractor, constructing bridge pier, to excavate to solid ledge, as required by plans and specifications, *held* not excused by towns' misrepresentation that solid ledge would be reached by excavating to line shown, where excavation was from 2 to 6 feet above depth so required.

**2. Bridges ⟳20(4)—Contractor's excavation to solid river bed, not reaching line specified, held not compliance with requirement to excavate to solid ledge.**

Contractor's excavation to solid river bed in building bridge pier, where not reaching line specified, *held* not compliance with contract requiring excavation to solid ledge, though engineer, whose approval was required, apparently believed that ledge actually formed river bed.

**3. Bridges ⟳20(4)—Alleged approval of engineer held not to excuse contractor's inadequate excavation, where contract required approval by board as condition to payment.**

Where contractor, constructing bridge pier, failed to excavate to depth required, fact that engineer or engineer's assistant may have approved work done did not relieve contractor from liability for breach, under provision that assistant's approval of improper work should not entitle contractor to payment, unless work was approved by board.

**4. Bridges ⟳20(4)—Satisfaction of engineer held not alone sufficient to relieve contractor, excavating for bridge pier under contract requiring excavation to "line shown" and engineer's satisfaction.**

Under contract for constructing bridge pier, providing excavation should go to "line shown" and should be done to satisfaction of engineer, satisfaction of engineer with excavation did not of itself relieve contractor from liability for breach.

**5. Contracts ⟳284(4)—Decision of engineer as to construction contract is final only where so provided by express terms or their equivalent.**

While in construction contract it is not necessary that decision of engineer, to be final, shall be declared final and conclusive in so many words, equivalent must nevertheless appear from terms of contract.

**6. Estoppel ⟳90(2)—Towns' recovery for defective construction of bridge pier held not precluded by final acceptance of work and payment therefor without knowledge of defects.**

In action by towns to recover damages from contractor for breach of contract to construct bridge pier, towns were not estopped from re-covering by fact that work had been finally accepted and payments made, where acceptance and payments were made without knowledge of defective performance.

**7. Contracts ⟳322(1)—Burden is on contractor to establish excuse for breach of construction contract.**

Where breach of construction contract is proved, burden is on contractor to establish his excuse in action against contractor for damages.

**8. Contracts ⟳1—Court must measure parties' rights according to contract, notwithstanding resulting hardship.**

Court has no choice but to make contract measure of parties' rights, even where hardship will result.

In Error to the District Court of the United States for the District of Vermont.

Action by Haverhill, N. H., and Newbury, Vt., against the United Construction Company. Judgment for plaintiffs, and defendant brings error. Affirmed.

Writ of error to the District Court of Vermont upon a judgment in favor of the plaintiffs (the defendants in error) against the defendant (plaintiff in error), entered upon the general and special verdicts of a jury.

The action is the same as was considered by this court in the opinion reported in 9 F. (2d) 538, which sets forth the general situation with enough detail, and to which reference may be had. Upon the second trial the plaintiffs, accepting the interpretation of the contract there laid down, proved that the piers had not been sunk to the depths specified upon the plans. These were elevation 385 on the western, or Vermont, side, and 394 on the other. The issue so arising was left to the jury, who by special verdict found that neither pier had been sunk to the required depth. As it was conceded that the solid ledge turned out to be between 15 and 35 feet lower than the lines shown on the plans, the plaintiffs contended that, not only had the defendant broken its promise to excavate to the solid ledge, but that it no longer had the excuse which had prevailed before; that, while the contract represented that the ledge would be found by excavating to the line shown, it gave no assurance that it could be reached earlier, and the defendant had therefore failed to prove any reliance upon the representation. Thus the breach of the contract to dig to solid ledge stood without excuse.

The defendant, on the other hand, maintained that the depths indicated upon the plans were not to be taken literally, but all parties understood that the piers should only

be well seated on the river bed, which was in practice accepted as the contract depth; especially that, since a river bottom and a ledge could not be understood as lying in a geometrically horizontal line, it was impossible to read the plans as meaning that the piers should exactly conform to the indicated depth. The deviations proved were not substantial enough to constitute a breach. Furthermore, even if this were not true, the plaintiffs had employed one Storrs as their engineer in charge of the work, who had in turn deputed two assistants, Marshall and Whitney (the latter formally in the defendant's employ), who had been present daily, as the work proceeded, and who had taken measurements of the depths to which the cofferdams were sunk, and had, if not expressly, at least by implication, assured the defendant that the excavation was in accordance with the plans. Again, the engineer, Storrs, had personally examined the foundation before the concrete was poured in, and had then accepted it as solid ledge; this also excused any default in failing to reach it.

Finally, the defendant insisted that it did not lie upon the contractor, as the District Judge charged the jury, to excuse his default in failing to reach the ledge; that it was misleading, and unfair to take the special verdict; and that it was error to admit certain evidence which tended to impair in the jury's minds the authoritative interpretation given to the contract on the first writ.

Louis E. Wyman, of Manchester, N. H., and M. P. Maurice, of Brattleboro, Vt., for plaintiff in error.

Charles H. Darling, of Burlington, Vt., and Raymond U. Smith, of Woodsville, N. H., for defendants in error.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). [1] On the main issue we think that the towns are right; the contractor confessedly did not dig to the solid ledge. That was a breach, and it was the cause of the bridge's collapse. We did not hold before, and could not properly have held, that the contractor might ignore this promise; but we did say that the specifications and the plans, when read together, assured him that what seemed like solid ledge at the prescribed depths he might accept as such. Thus, although his engagement remained to dig to the ledge, and though he was in default, he would have had an excuse,

22 F.(2d)—17

had he gone to the lines shown and found what he supposed to be the ledge. Yet we cannot see what use he can make of this representation, if he did not go to the elevations shown. There was no possible warrant in the contract for supposing that what he might find at lesser depths was the ledge he was seeking. It might be, or it might not, and he must take his chances. If he failed to go to the agreed line, he had not relied upon the representation of the contract.

[2] Nor can we accept the contractor's argument that the specifications and plans should be construed as meaning no more than that he should dig to the solid river bed. The engineers apparently did believe, not only that the lines approximately coincided with the river bed, but also that the ledge formed that bed. Perhaps it was natural for the contractor to conclude that the bed alone was intended, and to stop there; but that was not what he undertook when he agreed that the "excavation * * * shall be done to the line shown." That line meant the elevations shown on sheet two of scheme B, and these he neither reached nor tried to reach.

We agree that nobody could expect to find a solid ledge of straight horizontal surface, and we cannot, therefore, accept the dilemma, which the towns put, that, if the contractor did not dig to the line, he had not relied on the contract, while, if he went below it at any place, he knew that it was wrong. But they do not need this dilemma to succeed. It is enough if the plans meant, as we think they did, that whatever seemed solid at or below the lines was ledge. Perhaps, indeed, there was room for trifling discrepancies. Variations of a foot or less possibly were permissible, but in the case of the Vermont pier, which is the one that collapsed, the excavation was always between 2 and 6 feet above the line, and this in a foundation itself only 18½ feet in depth. No latitude of construction can tolerate such deviations as that. Thus there was a substantial, and indeed a very serious, failure to comply with the contract.

[3] The breach stood therefore bare, and to escape the contractor had to show some other excuse. He tried to do so by Marshall's evidence. We may assume, without deciding, that the reasonable implication of Marshall's conduct was that he supposed the cofferdams to have been sunk to the prescribed levels. True, he did not say so expressly, but it was at least permissible, considering Marshall's apparent activities, to conclude that he would have objected, had he thought the work was not being properly done. We need not, how-

ever, decide whether, if Marshall had been authorized to speak for the towns, this would have made out an excuse for performance, or have been a practical construction of the contract. We may assume as much arguendo, because the specifications, under the heading "Consulting Engineer," in any case dispose of the contention. The language is: "The assistants' approval of improper work or material shall not entitle the contractor to payment therefor, if the same shall not be approved by the board." The board never knew that the contractor had not dug to the elevations shown; they knew nothing whatever about the matter. Storrs, it is true, swore that he knew that the piers were approximately down to the line, in which he was quite mistaken. Perhaps he thought so because Marshall had told him; but his approval, if he gave it, would not help the contractor. The clause meant that no approval should count, unless the board, being advised that the work was improper, was content to accept it. Only so could it be protected from the negligence or disloyalty of the engineer's assistants. Nobody suggests that any such consent was ever given.

Next, as to the examination of the bottom by Storrs personally: After the contractor had sunk the cofferdams, and by a diver had examined and somewhat ineffectually cleaned the bottom, and when the time had therefore come when it proposed to begin to pour the concrete, Storrs was summoned to examine the foundation, and came to the site. His story, which the jury accepted, was that he pushed about with an iron rod and found rock and sand. The contractor's foreman on the job was present, and Storrs asked him whether the rock he felt was the ledge. The foreman said that it was, to which Storrs replied that, if this was true, he might begin to pour. Nothing more was said, though Storrs admitted that in fact he felt sure that the ledge had been reached.

[4, 5] The contract required the excavation, not only to go "to the line shown," but also to be done "to the satisfaction of the engineer." These are separate stipulations in the copula, and, unless the engineer had power to excuse the first, his satisfaction with the excavation was not enough. The contractor insists that he had, but we cannot agree. While we concede that it is not necessary that a contract shall in so many words declare that the decision of an engineer shall be "final and conclusive" (U. S. v. Hurley, 182 F. 776 [C. C. A. 8]), nevertheless the equivalent must appear within its four corners (Mercantile

Trust Co. v. Hensey, 205 U. S. 298, 27 S. Ct. 535, 51 L. Ed. 811, 10 Ann. Cas. 572; U. S. v. Walsh, 115 F. 697 [C. C. A. 2]; General Fireproofing Co. v. Wallace, 175 F. 650 [C. C. A. 8]). In the case at bar, not only does this not appear, but the contrary is manifest. It is quite true that, in case of any "dispute or difference" between the parties, the decision of the engineer is made final; but no dispute had arisen. Assuming that Storrs gave an unconditional assent, the contract did not therefore make it final; his powers, being so defined, could not be extended by implication. "Expressio unius." In fact, he never gave an unconditional assent.

It is also true that his instructions to the contractor were to be authoritative; but he gave none. All he said was that, if what he felt was in fact the ledge, the foreman might go ahead. This was conditional upon something on which he did not profess to pass. Perhaps he should have done so, but that is immaterial; his failure was not a substitute for his performance. Nor does it make the least difference whether the foreman was authorized to speak for the contractor. Storrs' assent remained conditional none the less, and the contractor was obliged either to persuade him to act on his own responsibility, or to accept the condition which he imposed. Indeed, as the thing fell out, Storrs had changed the situation not a bit; in substance, he left it to the contractor to make his own decision. Thereafter the latter's only course was to use his own judgment or to insist upon a less equivocal commitment; he chose the first.

[6] The last excuse is the final acceptance of the work by Storrs and the board, and the payment by the towns. As we have already said, the contract gave only a limited authority to Storrs. His approval and acceptance were not decisions of disputes referred to him, and could not conclude the towns, if unknown departures from the contract were later discovered. If the point be good at all, it must rest upon general principles of estoppel. But there could be no estoppel after the bridge was completed. It is one thing to approve work as it goes on, and so to induce the contractor to proceed; it is quite another to approve it when it is done. There are grounds enough for an estoppel in the first case, but none in the second. Payments made after completion are irrecoverable for quite another reason; if made with knowledge of the default they are voluntary, and the law sees no reason in justice to recall voluntary payments. In the case at bar neither

the board nor Storrs knew of the defects when the work was approved and paid for. On the contrary, they supposed both that the piers were on the ledge and were down to the line. Since they were not responsible for the performance in these regards, they remained free to object when the truth was disclosed.

[7] So much for the main issues. We need add little concerning the conduct of the trial. The charge presented the case quite as we understand it, and the requests either added nothing of substance, or should have been refused. The burden was upon the contractor to establish his excuse, once the breach was proved. The defendant got the full benefit of our earlier decision, which was not impaired by taking a special verdict. The evidence admitted was either competent and relevant, or could not have misled the jury in the face of a clear and satisfactory charge.

[8] So far as we can see, the contractor ignored the terms of his contract and substituted what he, perhaps correctly, supposed was everybody's understanding. It was a natural, but a perilous, course, and, having adopted it, the loss must fall where the words of the contract put it. Contracts are written to avoid such uncertainties, and, however hardly they may bear, we have no choice but to make them the measure of the parties' obligations.

Judgment affirmed.