### BENCH CANAL DRAINAGE DIST. v. MARYLAND CASUALTY CO.

(Circuit Court of Appeals. Eighth Circuit. December 14, 1921.)

No. 5862.

1. **Principal and surety ⬥⟹59—That surety is compensated cannot affect his liability.**

    The liability of a surety is measured by his contract, which cannot be given one construction where the surety is compensated, and a different construction where he is not.

2. **Principal and surety ⬥⟹100(3), 117—Material alteration of plans of work after contract and excess payments held to release contractor's surety.**

    The surety on the bond of a contractor for construction of irrigation canals and ditches, which made the plans and specifications a part of the contract and provided that they should not be changed to exceed 10 per cent. without the consent of the surety, *held* not liable for failure of the contractor to complete the work, where he was required after the work commenced to excavate an additional two feet throughout the system at a cost approximately double the cost of excavating nearer the surface, and the contract price would probably have paid for the work, if done in accordance with the original plan and specifications, and where also the percentage required by the contract and bond to be withheld from payments on partial estimates was not withheld.

In Error to the District Court of the United States for the District of Wyoming; John A. Riner, Judge.

Action at law by the Bench Canal Drainage District against the Maryland Casualty Company. Judgment for defendant, and plaintiff brings error. Affirmed.

H. C. Brome, of Basin, Wyo. (Thomas M. Hyde and R. B. West, both of Basin, Wyo., on the brief), for plaintiff in error.

William C. Kinkead, of Cheyenne, Wyo. (George F. Cushwa, of Baltimore, Md., and Kinkead, Ellery & Henderson, of Cheyenne, Wyo., on the brief), for defendant in error.

Before CARLAND, Circuit Judge, and YOUMANS and JOHNSON, District Judges.

YOUMANS, District Judge. This was a suit by plaintiff in error against the Maryland Casualty Company as surety on a bond executed by the company, to insure the performance on the part of the contractor of a certain contract entered into between the drainage district and one William P. Bullock for the construction by him of certain ditches or drains. The bond recites that a written contract dated June 16, 1916, was entered into between the contractor and the drainage district. A copy of the contract is attached to the bond and made a part of it,

·as if recited at length in the bond. The complaint alleged that Bullock, the contractor, had failed to complete the work stipulated for in. his contract. The condition of the bond is:

"That, if the principal shall indemnify the obligee against any loss or damage directly arising by reason of the failure of the principal to faithfully perform said contract, then this obligation shall be void; otherwise, to remain in full force and effect."

Then follows this provision:

"Provided, however, that this bond is executed upon the following express conditions, the performance of each of which shall be a condition precedent to any right of recovery hereon, anything in the contract to the contrary notwithstanding."

The ·conditions are five in number. The first relates to the right of the surety in the event of default upon the part of the principal to proceed with the performance of the contract. The second relates to the time within which suit shall be brought upon the bond. The third provides that the surety shall not be liable for damages resulting from strikes or from any act of God causing delay. The fourth condition is as follows:

"That the obligee shall faithfully perform all the terms, covenants and conditions of such contract on the part of the obligee to be performed, and shall also retain that proportion, if any, which such contract specifies the obligee shall or may retain of the value of all work performed or materials furnished in the prosecution of such contract (not less, however, in any event, than 10 per centum of such value) until the complete performance by the principal's part to be performed, and until the expiration of the time within which liens or notice of liens may be filed, and until the discharge of such liens, if any; and the obligee shall at all times observe and conform to the laws relating to liens of the state wherein said contract is to be performed. That the plans and specifications mentioned in said contract are not in any respect defective, and are and at all times will be kept adequate for the complete performance of such contract, and that no change shall be made in such plans and specifications which shall increase the amount to be paid the principal more than 10 per centum of the penalty of this instrument, without the written consent of the surety."

The fifth condition is as follows:

"That no right of action shall accrue upon or by reason hereof, to or for the use or benefit of any one other than the obligee herein named, and that the obligation of the surety is and shall be construed strictly, as one of suretyship only, shall be executed by the principal before delivery, and shall not, nor shall any interest therein or right of action thereon, be assigned without the prior consent in writing of the surety over the signature of its· president, or one of its vice presidents, attested by its secretary, or one of its assistant secretaries."

The answer sets up five defenses as follows:

(1) "That the contract referred to in said bond was, by plaintiff and said Bullock, and without the knowledge or consent of defendant, materially and substantially altered in its terms and substance, and thereby abrogated, and said bond and the defendant as surety thereon were thereby released and discharged."

(2) "That it is expressly provided in said bond, as an express condition thereof, the performance of which, is also by the terms thereof, made a·condition precedent to any right of action on said bond, anything in the con-

tract secured to the contrary notwithstanding, that in the event of any default on the part of the principal a written statement of the particular facts showing such default, and the date thereof, shall be delivered to the surety by registered mail, at its office in the city of Baltimore, Maryland, promptly, and in any event within 10 days after the obligee or its representative, or the architect, if any, shall learn of said default, and defendant further states that it is also provided in said bond that the obligation of said surety is and shall be construed strictly as one of suretyship only, and the defendant now states that plaintiff violated said condition in that it failed, refused, and neglected to so notify the defendant of the default of said Bullock within ten days after discovery of said default by said plaintiff and its representatives, or at any time, or in any manner or form for many days in excess of said 10-day period subsequent to the default of said Bullock; that by reason of the violation of said condition aforesaid this defendant was released from liability thereon and no action can be maintained thereon as against this defendant."

(3) "That besides providing particularly that the obligation of the surety named in said bond shall be construed strictly as one of suretyship only, said bond provides by its terms that the said plaintiff, obligee named herein, shall faithfully perform all the terms, covenants and conditions of said contract on the part of the obligee to be performed, and that said plaintiff shall and will retain that portion, if any, which said contract specifically provides shall or may be retained by it, of the value of all work performed or material furnished in the performance of said contract, and in any event not less than 10 per cent. of such value, until the complete performance by Bullock as principal of all the terms, covenants, and conditions of said contract on said principal's part to be performed; that by the terms of said bond it is likewise expressly provided that the retention of said 10 per cent. aforesaid is one of the express conditions thereof to liability on the part of said defendant, and a condition precedent to the right of plaintiff to maintain an action on said bond.

"In the contract, Exhibit A aforesaid, which is attached to and made a part of plaintiff's petition, it is also provided that, during the progress of the work therein provided for, monthly estimates should be made of the work done and material furnished on the ground by said Bullock, and accepted by the district, and that 10 per cent. of the contract price thereof, based upon said estimates aforesaid, should be reserved by the plaintiff, and not paid to said Bullock until 30 days after the completion and acceptance of the work under said contract by said commissioners and their engineer, and the defendant states that the plaintiff violated the condition of said contract, in that said plaintiff failed, refused, and neglected to reserve or withhold from said Bullock 10 per cent. of the value of said work as it progressed, or 10 per cent. of the aggregate value of said work; but, on the other hand, and contrary to the express terms and conditions of said bond and contract aforesaid, the plaintiff not only failed to reserve said percentage of said work, but it paid to said Bullock from time to time on said contract more than was due him for work performed and material furnished, without regard to, and without any monthly estimates having been made, and this the plaintiff did knowingly and wittingly and in total disregard of the conditions of said bond and contract, and plaintiff states that by reason of said violation of the express provision of said bond, the performance of which is made a condition precedent to the right to institute an action thereon, this defendant and said bond were released and discharged, and no action can be maintained thereon."

(4) "That it is also expressly provided in said bond as an express condition to liability thereunder, the performance of which is thereby made a condition precedent to any right of recovery thereon, anything in the contract secured to the contrary notwithstanding, that the plans and specifications mentioned in said contract, and the plans and specifications for the performance of which work by Bullock are referred to in and made a part of said contract, are not in any respect defective, and are, and at all times will be kept, adequate for the complete performance of such contract, and no change shall be made in said plans and specifications which shall increase the amount to be paid the principal more than 10 per cent. of the penalty of said bond, without

the written consent of the defendant, and the defendant states that defendant [plaintiff] violated said condition knowingly and wittingly and without the consent of said defendant, in that said plans and specifications aforesaid, were in many respects grossly defective, and insufficient for the purpose for which they were made; that said plans were indefinite, uncertain, and misleading to contractors and especially to said Bullock, and, under those circumstances, it was claimed and contended by the plaintiff and the engineer in charge of the work, that said Bullock was required to dig said drainage ditch a foot lower than was shown on the plans and specifications aforesaid, he was not required to dig said drainage ditch said extra foot in depth, said district and the commissioners thereof persisted and were successful in compelling the said Bullock to construct said drainage ditch said extra foot in depth; that said contrary contentions resulted from the defective, uncertain, and indefinite condition of said plans and specifications, and because of the uncertainty thereof; that this defendant had no knowledge of the defective condition of said plans and specifications at the time said bond was signed by it, nor did it learn of the defective condition of said plans and specifications until long after it was claimed by plaintiff that the said Bullock had made default in the performance of the conditions of his construction contract and defendant further states that said plans were not at the time said contract was entered into by said Bullock, nor have they ever been since that time, kept adequate or suitable for the performance of said contract."

(5) "That in the progress of said work the plaintiff and the said Bullock by mutual consent wholly disregarded the terms and conditions of said contract and plans and specifications under which said work was to be performed; that material and substantial parts and portions of the ditch, which was required to be constructed under said contract, were abandoned by mutual consent, and by the mutual obligations of plaintiff and the said Bullock other ditches of substantial length, and of a length greatly in excess of the length of said abandoned ditches, and which said other ditches were not specified in said contract or the plans and specifications made a part thereof, were agreed to be constructed and were constructed by the said Bullock by mutual consent of himself and plaintiff, and instead of said abandoned ditches, all of which was without the knowledge or consent of this defendant."

At the conclusion of plaintiff's testimony the defendant moved the court to direct the jury to return a verdict for the defendant. This motion was denied. Defendant then introduced its testimony, and at the conclusion of all the testimony defendant renewed its motion for a directed verdict. This motion was by the court sustained.

Five assignments of error are relied upon for a reversal. The first four relate to the action of the court in directing the jury to return a verdict for defendant. They are discussed together in the brief. The fifth assignment relates to the action of the court in excluding certain testimony. Counsel for plaintiff in error contend that there was testimony sufficient to go to the jury. That requires an investigation of the testimony.

The plans, specifications, and profiles for the drainage system and ditches were made in 1912. The contract was let to W. P. Bullock on June 17, 1916. The contracts bears that date, but it did not become effective until the bond was executed and accepted by the drainage district. The bond bears date of July 20, 1916. It was not accepted by the commissioners of the drainage district until in August or September following. It is stated in the bond that the contract is made a part of the bond "as fully as if recited at length" therein. The nineteenth paragraph of the contract contains the following provision:

"It is understood and agreed that there are no written or verbal agreements outside of this contract."

The engineers who drew the plans, specifications, and profiles did not superintend the work. Mr. G. W. Zorn was the engineer for the drainage district at the time of the letting of the contract, the execution thereof, and the acceptance of the bond. It is admitted by the drainage district that the ditch was required to be dug one foot deeper than was contemplated by the original plans, specifications, and profiles. It is contended by the casualty company that as a matter of fact the ditch was dug at least two feet deeper than originally intended. The first controversy arises with reference to what the profiles showed at the time of the letting of the contract. There is a conflict of testimony on that point. Therefore the testimony on behalf of the plaintiff must be examined. This examination must be made in the light of the stipulation in the bond:

"That the plans and specifications mentioned in said contract are not in any respect defective, and are and at all times will be kept adequate for the complete performance of such contract, and that no change shall be made in such plans and specifications which shall increase the amount to be paid the principal more than 10 per centum of the penalty of this instrument without the written consent of the surety."

On direct examination Mr. Zorn, the engineer, testified for the plaintiff as follows:

"These are correct blueprints of the profiles which were submitted to the bidders including Mr. Bullock, prior to the submission of the bids on June 16, 1916. I had a discussion with Mr. Bullock and the other bidders prior to the time they submitted their bids there, with respect to the depth these drains were to be dug. I explained to the bidders that I deemed the—

"Mr. Kinkead: We object to that as incompetent, irrelevant, and immaterial, and an attempt to explain or vary by oral explanation the profile as shown here in evidence and the depth of the ditches as shown by these profiles.

"Overruled. Exception by defendant.

"I explained to the bidders that I deemed the drains of insufficient depth as originally planned and in order to make a change, or to present the plans as I wanted it, I changed the elevations of the grade points of the profiles on the maps or on the profiles. These changes are shown on the profiles as they were changed prior to the letting of this contract.

"By Mr. Brome: Q. What effect did the change that you had made on the profiles, prior to the letting of the contract, have on the depth of the ditches? What I mean is, did they require them to be dug deeper?

"Mr. Kinkead: That is objected to as leading and suggestive as against the bonding company.

"Overruled. Exception by the defendant.

"A. The change I made—that is the established plan of these profiles to submit to the bidders—

"Q. What I want to know is whether the profile before you changed it, and the profile after you changed it, had any effect in the amount of work to be done?

"Mr. Kinkead: We make the same objection.

"Overruled. Exception by defendant.

"A. It made a difference; yes.

"Q. What difference? A. It was a foot deeper than the original profiles were designated.

"Q. You may state whether or not the question of how much the change in elevation sent the ditches deeper into the ground was discussed with Mr. Bullock and other contractors before they bid? A. It was."

From this testimony it appears that the engineer undertook to provide for an increased depth of one foot by changing "the elevations of the grade points of the profiles on the maps or on the profiles." On cross-examination Mr. Zorn testified as follows:

"Q. Now, Mr. Zorn, you say that the altitude has been changed, so as to lower this ditch on these profiles one° foot; that is, the height above mean low tide? A. I will say that the distance from the surface line, as shown there, was changed one foot lower than was originally planned on the profile; yes, sir.

"Q. I notice on these exhibits here, from 7 to 13, inclusive, that certain figures below the proposed ditch have been changed, and other figures·substituted. What did those figures, before they were scratched out, represent? A. They represented the grade points, and elevation of grade points, at those different stations before the profile was changed.

"Q. What was the basis for those figures? Where did you measure from? A. From sea level datum as used there.

"Q. Will you please state what those three practically horizontal lines on these profiles represent? A. The upper line represents the surface of the ground, and the next line represents the gravel line, and of course it does not in all cases—sometimes it is gravel, and it is sand sometimes, and sometimes there are other lines in there, which indicate there was water on the surface, or where they struck water. The lower line does not represent anything on that profile.

"Q. It does not represent anything, then, in any of the plats and profiles that were submitted to the bidders; is that right? A. What I mean there by that is that the grade points or governing points for that profile, for grade of the tile, is not the line as shown on the profile.

"Q. Then these profiles did not mean what they said; is that what you mean to be understood as saying? A. No, sir; I don't mean that at all.

"Q. Well, now, these profiles were on regular blueprint paper, divided into spaces laterally, of 5 feet weren't they? A. Yes, sir.

"Q. And horizontally of one foot? A. Laterally the scale those are drawn on is 50 feet. These vertical lines are 50 feet apart, as represented on that profile. The horizontal lines are one foot apart.

"Q. The heavy lines are 50 feet apart? A. Yes, sir.

"Q. The lighter lines, running up and down, are 5 feet apart? A. No; they are five stations; that is, 500 feet.

"Q. How many feet between here and there? A. 50 feet.  *  *  *

"Q. Are those exact copies of plats and profiles that were furnished to these bidders on this system as it was then proposed? A. I think they are; I don't see any difference.

"Q. And these· have no alterations on them, have they? A. I didn't notice any.

"Q. Or any erasures that were not there at the time the contractors bid? A. No, sir; I don't think so.  *  *  *

"Q. Now, then, Mr. Zorn, the paper on which this profile was drawn is so divided as to show the number of feet, particularly between two points? A. Yes, sir.

"Q. And to look at these plans, these profiles, you could immediately, by counting the lines between the line representing the level of the ground, and the line representing the bottom of the ditch, determine the depth of that ditch? A. Approximately you could; yes, sir.

"Q. Now, as a matter of fact, lowering of the altitude there would not lower the bottom of that ditch, any more than it would lower the sand level or the surface line, would it? A. I don't know as I understand your question exactly.

"Q. (Question read.) A. It would not lower the surface line.

"Q. Isn't it a fact that these three lines, the lines showing the surface of the ground, the level of the gravel, and the bottom of the ditch, are abso-

lutely of the altitude one foot, would lower all three at the same time?   A. No, sir.

"Q. Where is there anything on this plat to indicate that those three lines, the relative distance of those three lines, has been changed?   A. The elevations at the change of the grade points.

"Q. Now, then, these figures that are marked out here, showing the elevation, were originally made by Bell and Schneidler?   A. Yes, sir; I think so.

"Q. Who marked those figures out and substituted others?   A. I did.

"Q. You did that yourself?   A. Yes, sir.

"Q. On the original plan?   A. Yes, sir.

"Q. Now, then, you say that you called in the contractors to explain to them that those figures meant a difference of depth of one foot in that ditch?   A. I explained to them that it was to be one foot deeper than originally planned.

"Q. You explained to them that it was to be one foot deeper than as shown on the plans?   A. Than as originally planned.

"Q. Why did you find it necessary to do that?   A. I made that change in order to get better drainage.

"Q. Why did you find it necessary to make that explanation to contractors and bidders?   A. I wanted them to understand just how the profiles were.

"Q. And, without that explanation on your part they would not understand, would they?   A. Some might not, and some would.

"Q. So it required your oral explanation there of the purpose of changing the figures to make these plans definite and certain?   A. I wanted them to understand fully the profiles and plans.

"Q. (Question read.)   A. No, sir.

"Q. You knew that it was the general custom of engineers and contractors bidding on work of this kind, to count these little spaces here laterally between these lines on these profiles to ascertain the depths of that proposed ditch, didn't you?   A. Yes, sir.

"Q. That is the custom?   A. Yes, sir.

"Q. And that it was necessary for you to make that explanation there to induce them to depart from that custom; that is right, isn't it?   A. Well, I would answer it the same as before; I wanted them to perfectly understand these profiles."

It appears from the cross-examination of Mr. Zorn that an oral explanation to the bidders was necessary in order that they might understand that an increased depth of one foot was required. It also appears from such cross-examination that the manner of indicating depth by means of elevation above sea level was not customary. It thus clearly appears that the plans and specifications were defective in that respect.

Mr. Zorn also testified as follows:

"Q. Well, now, as a matter of fact, these ditches here, as appear on Exhibit B and Exhibit C, are greatly in excess of the distance between the top and bottom line on this profile showing stations 230 to 355 of drain B; isn't that a fact, and I present you that profile for examination?   Aren't those depths, as shown on Defendant's Exhibit B and C, greatly in excess of the depths as determined by the spaces between the lines on that profile of drain B?   A. No, sir; I think not.

"Q. Now, then, where did you take those figures from on Exhibits B and C?   A. They were taken from the note books.

"Q. And not from these profiles?   A. In constructing the drain we had to establish and run our levels and get out data from which to compute the cut at different points along the line, and they were taken from the note books for that purpose.

"Q. They were not taken from these profiles?   A. The grade line of the profile was followed.

"Q. That is, it should have followed the note book? A. It should and did.

"Q. Did you take the figures from the note book and not from the profiles? A. I took the grade points from the profiles.

"Q. I am speaking of these depths, Mr. Zorn, don't you understand? A. Yes, sir.

"Q. I am asking you where you got these depths that are shown on Defendant's Exhibits B and C, whether from the profiles or from the note book? A. It would be out of the question to get them from the profiles; you can't read them.

"Q. Then you did not get them from the profiles? A. No, sir."

Mr. Zorn testified further as follows:

"Q. Then these profiles here represent the field notes of surveys and levels that were made and run by Bell and Schneidler? A. Yes, sir.

"Q. And do not represent the field notes according to the survey made by you? A. No, sir.

"Q. And when you changed these figures here to show a uniform increased depth, as you say, of one foot, that did not even compare with the surveys and the levels and the depths that you have determined upon in your field notes, nor the grades? A. I used the grades of the profiles, but this was another survey.

"Q. Another survey that you made, but no plat or profile was ever made according to that survey? A. No, sir.

"Q. Then Mr. Bullock, at the time he figured on this job, and at the time he started into construction of this work, did not have any plans or profiles according to that survey, did he? A. No, sir."

These extracts from the testimony show that another requirement was violated, in that the plans and specifications in the contract were not at all times kept adequate for the complete performance of the contract. The profile of the ditch showed a surface line and a grade line. It also had on it figures which showed the elevation above sea level at different points along the ditch. The contention of the surety company is that the grade line indicated the bottom of the ditch and therefore a measurement, according to scale, from that line to the surface would give the depth of the proposed ditch.

The drainage district contends that the depth of the ditch should properly be ascertained by subtracting a certain given elevation above sea level from another given elevation. Mr. Zorn himself admitted that the former is the customary method. Upon that point Mr. Bullock, the contractor, testified as follows:

"I followed engineering, but not of this class, for a number of years prior to this. As drainage contractor, I was engaged in that only about 18 months prior to this particular work, but from 1889 to 1893 I was connected with the Coast Geodetic Survey at Washington, and from 1893 to 1905 I followed railroad engineering, and from 1905 to 1914 I followed municipal engineering. During all that period I have had to do with plans and plats such as those introduced in evidence. I have made a great many profiles; at least one-third of my work was sewers for which profile and grades were established, and possibly one-third of it was railroad work. I have also had to do with the submission of jobs or work and the construction thereof. The profile you just handed me of drain D between stations O and 79 is a copy of blueprint from the same tracing from which one was made and handed me for my guidance in bidding on this work; it is identical with the ones that were furnished me. The first thing I looked at, after receiving this profile, before observing the line, was the scale. I notice here that the horizontal scale is 1 inch to 200 feet, and that the vertical scale, or the scale up and down, which represents

the depth of the cut vertically, is 1 inch equals 20 feet. After that information was secured, I took a scale divided 20 to the inch, and went over these profiles very carefully.

"The rule that I hold in my hand is the ordinary rule that engineers carry. I always carry one about half as long as this. The divisions were 20 divisions to the inch, represented to follow this scale, and used to determine the depths. In examining these plats, I had nothing else to go by except the scale and drawing. The divisions on the plat correspond perfectly, but were of no consequence. When I had the scale the lines were not necessary, but they did correspond. The scale, as given by the engineers who drew these plats, was for the guidance of the bidders in determining the distance between the lateral lines, representing the depth. I know of no other purpose it could have been provided for. The scale of 1 inch to 200 feet is to determine the length of the ditch, and the vertical scale of 1 inch equals 20 feet is to determine the depth of the trench. Below some of the stations there are certain elevation figures which are obliterated, and others seem to be sub stituted for them. There is nothing to indicate on this profile what that is; but, knowing the altitude of Germania Bench was something like 4,000 or 5,000 feet, I naturally imagined it meant the elevation above sea level. These figures have no significance and furnish no information as a guide to bidders on a project of that kind. My bid would have been the same whether the altitude of Germania Bench had been 5,000 feet above sea level or 1,000 feet above sea level. It is only important to determine climatic changes which would affect the work. In getting a plan, having a scale before you, and knowing the scale, having it marked on the map, you can measure the height of a building or depth of a cut from that vertical scale and from the drawing. The altitude of the place at which the building would be erected, or the altitude of the place at which the ditch would be excavated, would, in my opinion, have no bearing in making up the cost of making the excavation. It purely represents, from the surface line to the grade line, the depth of cut you are required to dig. The fact that the elevation figures had been changed would not indicate that the depth of the ditch had been increased, unless the drawing was changed and the scale changed. There would be two effective ways to indicate on these plans a change of one foot in the depth of the ditch—either change the scale as indicated on the plat, or else draw a line below increasing the distance between the surface line as indicated and the grade line as indicated. If you change the scale it would appear in fractions. The most effective way would be to make a new profile. I have heard the testimony of Mr. Zorn.

"Q. You may state whether or not, before you made this bid, or before the contract was signed by you for the construction of this work, he ever stated or indicated to you that this ditch was to be a foot deeper than is shown on the profile.

"Objection by Mr. Brome. Overruled. Exception by plaintiff.

"A. No, sir."

### Mr. Bullock, continuing:

"I first ascertained that I was required to construct the ditch one foot deeper as shown between the lines on the profile by telegram from my subcontractor on June 18, 1917. I was then in Kansas City. In making my bid and submitting my proposal, I measured the distance between the surface line as indicated, which is the only natural line to guide; the grade line being an absolutely imaginary line fixed at a certain distance below the surface of the ground as indicated, with a scale. After learning what the scale was, I measured between those lines; no one ever told me that I was expected to go a foot deeper than shown on these profiles. After entering into this contract I sublet a part of the work to H. R. Elliott of Montrose, Colo. He began work on the 15th of April, 1917; he wired me that something was wrong with the profiles. I left on the 19th of June for Greybull. Mr. Elliott met me at the train. We telephoned Mr. Zorn, who either came to the hotel or his office

that night. Mr. Elliott had been at work on the ditch, but had discontinued at that time. We went out on the work the next day; the three commissioners were there; I do not know if Mr. Zorn was there or not. We went out to look at the work. Mr. Elliott was then laying tile almost three feet deeper than the cut was indicated, which was the first time I knew that Zorn was claiming the ditch was to go deeper than the profile showed, except the wire I received in Kansas City several days before. The first time I talked with Zorn was the evening before. The members of the board were not present; they considered the matter on Germania Bench the next day. I don't know whether any minutes was made of the meeting; that was June 23, 1917. There seemed to be so much dispute between Zorn and myself that the commissioners did a great deal of considering before they expressed themselves one way or the other. Previous to this time I had sublet this work to Mr. Elliott for the use of a Sargent machine which I have no reason to doubt was of such capacity that it would have constructed this ditch and would have been answerable for that purpose as per the profile. Mr. Elliott threatened to quit the work, and I was required to increase his compensation from 23 cents to 50 cents a foot."

According to the contention of the drainage district the grade line served no useful purpose, so far as the profile in this instance was concerned. Mr. Zorn, however, permitted the grade line to remain on the profile and, according to his statement, undertook to eliminate it by oral instructions. Bullock, the contractor, denied that such instructions were given. The importance, therefore, is clearly seen of that condition of the bond which required that the plans and specifications mentioned in the contract were not in any respect defective, and that they should at all times be kept adequate for the complete performance of the contract. The purpose of these requirements was to avoid what actually occurred; that is, a dispute as to whether or not an oral change was actually made.

Mr. Charles C. Carlisle testified for defendant as follows:

"My business is consulting engineer. I have been in that profession 19 or 20 years; during that time for approximately 5 years I was deputy state engineer of Wyoming and city engineer of Cheyenne. Since that time I have been employed in a consulting capacity on waterworks, sewers, electric light, and irrigation works, principally. My work largely has been the observation of plats and plans and the supervision of work of this kind. I have had to do with the drawing and investigating of profiles, ditches, earth excavations, and drains.

"Q. I will ask you to examine this exhibit containing the profile of drain D from stations 0 to 20, and from stations 20 to 79, and 368, and state what you, if desiring to bid on a construction of this kind, would take into consideration in arriving at the depth of the ditch shown thereon?

"Mr. Brome: That is objected to as incompetent, irrelevant, and immaterial. I am perfectly willing for the witness to state what the paper shows, but I do not think it is competent for him to state what a contractor would take into consideration.

"The Court: He is testifying as an expert, that has been gone over to this jury five or six times.

"A. I would determine the scale on which the profile was made, and determine the distance between the surface line, or profile of the ground, and the grade line, in vertical elevation.

"Q. Where would you look to determine the scale? A. I would look to the legend on the drawing.

"Q. Does that legend appear on that plat? A. It does.

"Q. And after you determined the scale then you would measure, according to that scale, between those lines, is that right? A. Yes; either scaling it or counting it, counting the number of spaces indicating the feet.

"Q. Now, what significance, Mr. Carlisle, would the figures below the station have upon your bid, before they were erased there? A. They would have nothing to do with the relative position of the two lines, the grade line, and the surface lines, and they are not usually put on profiles.

"Q. What significance, if any, would the fact have that those figures were erased and others substituted, in determining the depth of the ditch? A. It would not affect the depth of the ditch, except it might displace the whole drawing slightly on the profile paper.

"Q. So the lowering of the depth would take the top and the sand level and all with it, would it? A. Yes; it has more to do with the altitude of the country than anything else.

"Q. Then, so far as those figures are concerned, and so far as a guidance to a determination of the depth of that ditch, those three lines shown there, indicating the depth of the ditch are arbitrary; is that right? A. Yes; they have a relationship to each other.

"Q. Have you examined all of these plats, Mr. Carlisle? A. I have.

"Q. And would your testimony as to each of them be the same as it is of the plat which you hold in your hand? A. It would.

"Q. Now, I will ask you if you have made any calculations, from the depths that have been given in evidence by Mr. Zorn, to determine whether the depths as given by him are the same as given in these plans and plats? A. I have.

"Q. And as to what ditches? A. On drain B the elevations and depths as given in Exhibits B and C. They are the only depths that I had. I compared them with the profiles, and determined the difference between those cuts and what the profile showed.

"Q. And what did you find as to the difference, if any? A. In the 81 stations, or 81 points given, the average depth of the cut shown by the notes was 2.19 feet deeper than the profile showed.

"Q. And how many stations did you say you examined? A. Going by half stations—each 100 feet represents a station—the points were set at each 50 feet distance, or determined as 81 points.

"Q. Where did you get the depths as given by Mr. Zorn? A. From the Exhibits C and B.

"Q. That is, Defendant's Exhibits B and C? A. Yes, sir.

"Q. And you say that these depths, as given by Mr. Zorn, averaged 2.19 feet deeper than the profile showed? A. Yes.

"Q. Now, have you had experience also in the constructing of trenching and ditching, Mr. Carlisle? A. As an engineer and supervisor of construction work.

"Q. And in the relative cost of the movement of the material in such work as might be encountered in this state? A. I have.

"Q. Now, assuming that the contemplated ditch was an average of 7 feet, and that in the execution of the work the ditch ran from 1 to 3 feet deeper than as shown on the profiles, and assuming that in that extra depth a cement gravel was encountered, what would you say that that extra depth and that soil would encrease the cost of the work?

"Mr. Brome: That is objected to as incompetent, irrelevant, and immaterial. "Overruled. Exception by plaintiff.

"A. It might double the cost of the excavation, depending, of course, on the material encountered, and whether there was ground water."

One of the defenses of the surety company is that the condition of the bond which required that the drainage district should retain not less than 10 per cent. of the value of all work performed, or material furnished in the prosecution of the contract, until the complete performance thereof by the contractor, was violated. That 10 per cent.

was not retained, as required by the bond, clearly appears from the testimony.

Exhibits D, E, F, and G were certain books kept by Mr. Zorn. Those books were taken by Mr. Carlisle, and from the figures contained ·in them he determined the depth of the ditch, and found it to be in excess of two feet over that indicated by the original profile. Those calculations made from Mr. Zorn's notebooks, and being undisputed by him, must be taken as correct. Therefore the testimony shows: (1) That the depth of the ditch was by verbal order increased by Mr. Zorn one foot over that indicated by the original profile. (2) That it was necessary to explain this change orally to bidders. (3) That the profile did not indicate the change in the customary way. (4) That the profiles were not kept adequate as required by the provisions in the bond. (5) That as a matter of fact the depth of the ditch, as the contractor was required to dig it, was in excess of two feet over that indicated by the original profile. (6) That the 10 per cent. was not reserved as required by the bond.

At the time the motion for a directed verdict was made, the following colloquy occurred between the court and the attorney for the drainage district:

"The Court: Mr. Brome, I want to ask you a question. In your petition in this case you claim a recovery for this additional depth, the estimated cost?

"Mr. Brome: No, sir; we claim recovery only for the depth as we claim the true depth is, but not beyond that.

"The Court: You paid him in your payments for the average depth of 2 feet below the line specified in the contract?

"Mr. Brome: Yes; for whatever yardage—

"The Court: The testimony here is an average of two feet below the line on the profile?

"Mr. Brome: Sometimes below that line, and some places above that line.

"The Court: Mr. Carlisle testified that the average was two feet.

"Mr. Brome: But he testified only over a portion of the line. The entire line he had not computed.

"The Court: That additional two feet is not provided for in this contract?

"Mr. Brome: No, sir; nothing provided in the contract, except the figures that appear there.

"The Court: All the surety company had was the contract?

"Mr. Brome: They had more than that; they had the specifications which provided that changes might be made by the engineer during the progress of the work.

"The Court: That is true; small changes, but not such as would amount to the reconstruction of the ditch. It is a matter of common knowledge, without evidence, that the last two feet of the ditch costs a whole lot more than the first two. Now, then, do you wish to say that it was in contemplation of the parties at that time that the ditch should be 2 feet deeper than the specifications called for?

"Mr. Brome: No, sir; but I do say, with respect to that, that if the ditch was constructed two feet deeper it would not avoid the liability on this bond at all, but if the construction of the ditch cost the contractor more money for the two feet deeper, he would be entitled to credit on the amount due on the extra cost; whatever it was, and if the extra cost exceeded the damage that the district had sustained, because he had not completed his work, the plaintiff could not recover in this action, but it is precisely like the defense and precisely like every other departure in the case of a compensated surety. The departure must have occasioned damage to the surety. If they went deeper than the contract called for, and it cost the contractor more money to dig the

dirt out of the bottom of the ditch, then, if they have proven what that additional cost and damage was, they are entitled to credit on the amount the plaintiff claims, whatever it is, and if that amount exceeds the plaintiff's claim, they would be entitled to a verdict here. * * * If we departed from this contract, that did not void the contract; but if the departure occasioned injury to the surety, we cannot recover to the extent of that injury, whatever it is; but the burden of proof is upon the defendant, the surety company in this case, to show that we did depart from the contract, and what the amount of injury is, if any sustained by them was, and that is an issue of fact to be tried out to the jury. That is my view of it.

"The Court: While that is the rule as to individual sureties, and it is true that the rule has been relaxed as to compensated sureties, surety companies, yet the rule as relaxed must have a reasonable construction, and the company had a certain contract and specifications before it when it made its bond. I think from this evidence we would have pretty hard work to figure out what contract this man was working under. Here is an entirely new contract for two feet deeper: the contract has been changed, the work was changed, and all of that costs money. There is always some slight deviations from the exact terms of a contract which an individual surety would have a right to rely upon, probably, that a compensated surety would not, and which would not avoid the liability; but here there has been such a departure that it seems to me there is absolutely no basis upon which the court could submit to the jury such a question in this case. The testimony of both plaintiff and defendant tends to show that here was certain work secured by a bond, and additional work, not in comtemplation of the parties at all, was done, which destroyed the ability of the contractor to perform according to the specifications. Had it not been for the additional two feet, the amount you paid him would probably pay for the construction as outlined by the specifications put before the surety company before they would sign this bond. They did not insure anything of that sort, but your contract was secured, and if they had followed the specifications strictly, with some slight variations, that would not avoid the liability, and the court would not listen for a moment to a question of that kind; but certainly 'it was not in the contemplation of the parties, when the bond was signed, to go two feet below the grade line as fixed by the specifications, and therefore I do not think there can be any recovery whatever against this surety. All this change took place after the contract was signed, which had nothing to do with it; but I allowed it to go in, in order to get whatever was said about it. The thing that binds the surety company is the contract and specifications, and, while we will give to them a liberal construction, yet I do not think we can go quite so far as to say we can compel a contractor under his contract and these specifications to go two feet deeper than the grade line, and then charge him up, and charge the surety with a failure on his part, when it was brought about and induced by your own engineer. He insisted upon this grade being lowered, and the contractor was obliged to do that. Had he followed the specifications, as I said a moment ago—I have but worked them out roughly in my mind—the compensation you paid him would pay for the whole work originally planned, and therefore there would be no liability here if that had been the case. But the addition of this average of two feet on the entire system additional depth, and the additional expenses over and above every one knows that the last two feet would cost probably, as Mr. Carlisle testified, just about double, at least I so understood it; but there would be at least a very substantial increase in cost. Now, then, here is the proposition: If the contractor had followed the plans and specifications, if there had been a shortage, there would be no question about the liability upon this bond; but the departure from it was so far that, notwithstanding the liberality and relaxation of the surety rule, which the courts now hold is applicable to surety companies—that is, surety for compensations—that I do not think that rule can apply here. I will sustain Mr. Kinkead's motion."

[1] The argument there made by the attorney for the drainage district is repeated in his brief; that is, the defendant in error, being a compensated surety, would not be released from the bond, except to the extent of the damage sustained by reason of the increased cost resulting from the additional requirement made upon the contractor. The bond is a contract between the parties. The enforcement of the express terms of the contract of suretyship cannot be made to depend upon whether the surety is compensated or not. It cannot be one contract when the surety is compensated, and another contract when the surety is not compensated. The surety had the right to impose such terms as it saw fit before it consented to become liable, and the obligee had the right to accept or reject such terms. The drainage district required that the bond be presented and accepted by it before the contract should become effective.

[2] The surety here has the right to insist that it is released when it shows that the drainage district failed to comply with the terms of the contract which it accepted. We agree with the trial court that the additional depth required of two feet could not be regarded as permissible under the specification allowing changes. The changes contemplated by the contract were minor changes that did not increase materially the cost of construction and the amount of work to be done. The additional depth of one foot, or two feet, greatly increased the cost of the work. Prairie State Bank v. United States, 164 U. S. 227, 17 Sup. Ct. 142, 41 L. Ed. 142; Justice v. Empire State Surety Co., 218 Fed. 802, 134 C. C. A. 490; O'Neal v. Kelley, 65 Ark. 550, 47 S. W. 409; Miller-Jones Furniture Co. v. Ft. Smith Ice & Cold Storage Co., 66 Ark. 287, 50 S. W. 508.

With reference to the assignment of error that the court refused to permit the witness, Preis to state that Mr. Zorn had told the bidders before the bids were opened that the ditch would be required to be dug one foot deeper than shown by the profile, it appears from the record that this testimony was offered in rebuttal and objection was made on the ground that it was not properly rebuttal testimony. Assuming, without deciding, that the testimony would have been competent, if offered in chief, we think that it was within the discretion of the court to exclude it as rebuttal testimony. Moreover, the plaintiff in error suffered no injury by reason of the exclusion of the testimony.

We think the judgment was right, and should be affirmed. It is so ordered.