## MASSACHUSETTS BONDING & INS. CO. v. JOHN R. THOMPSON CO.*
### No. 10735.

Circuit Court of Appeals, Eighth Circuit.
Feb. 25, 1937.

On Motion to Modify Opinion March 30, 1937.

*Writ of certiorari denied 57 S.Ct. 941, 81 L.Ed. ——.

David A. Murphy, of Kansas City, Mo. (John T. Harding, R. C. Tucker and John Murphy, all of Kansas City, Mo., on the brief), for appellant.

Cornelius Roach, Jr., of Kansas City, Mo. (M. W. Borders, Sr., M. W. Borders, Jr., and Dupuy G. Warrick, all of Kansas City, Mo., on the brief), for appellee.

Before STONE, SANBORN, and WOODROUGH, Circuit Judges.

SANBORN, Circuit Judge.

This appeal is from a judgment for the appellee in an action at law brought to recover upon a bond executed by the appellant to insure the performance of a construction contract.

John T. Peek, on December 8, 1932, contracted with the John R. Thompson Company (hereinafter referred to as the plaintiff) to remodel the first floor and connecting basement of the Sexton Hotel Building in Kansas City, Mo., which premises the plaintiff had leased under a 25-year lease, at a rental of $1,000 a month. The remodeling was to be done for the purpose of adapting the premises for use by the plaintiff as a restaurant. This work, by the terms of the contract, was to be in accordance with certain drawings and specifications made a part of the contract, and was to be completed within sixty working days, for a price of $29,400. One of the provisions of the contract was: "It is further agreed that said party of the first part [plaintiff] may at any time during the progress of said work make any additions to, or alterations or deviations from, said drawings and specifications, without invalidating this agreement; but a fair value of the same shall be added to or deducted from, as the case may be, the moneys herein agreed to be paid by the said party of the first part, * * *."

On December 13, 1932, Peek, the contractor, as principal, and the Massachusetts Bonding & Insurance Company, as surety, executed and delivered to the plaintiff a bond for $15,000, conditioned as follows: "Now, Therefore, the condition of this Obligation is such that, if the Principal shall faithfully perform the Contract on

his part and shall fully indemnify and save harmless the Owner [plaintiff] from all cost and damage which he may suffer by reason of failure so to do and shall fully reimburse and repay the Owner all outlay and expense which the Owner may incur in making good any such default, and * * * if the Principal shall pay * * * for labor or materials * * * then this Obligation shall be null and void, otherwise it shall remain in full force and effect. * * *" The bond also contained this provision: "And Provided, that any alterations which may be made in the terms of the Contract, or in the work to be done under it, or the giving by the Owner of any extension of time for the performance of the Contract, or any other forbearance on the part of either the Owner or the Principal to the other shall not in any way release the Principal and the Surety or Sureties, or either or any of them, their heirs, executors, administrators, successors or assigns from their liability hereunder, notice to the Surety or Sureties of any such alteration, extension or forbearance being hereby waived."

The contractor commenced work on December 18, 1932, and continued until December 29, 1932, when the work was suspended to permit the plaintiff to alter the drawings. On or about that date, the contractor and the plaintiff agreed, by "Contract Change No. 1," to eliminate the ventilating and steam fitting from the contract, and that this elimination should reduce the contract price by $3,824. On April 20, 1933, "Construction Order No. 2" was executed by the plaintiff and the contractor. This order canceled the original drawings and specifications, and substituted new ones. It fixed the value of extra labor and materials required by the new drawings at $13,987.84. The construction order expressly made the new drawings and specifications a part of the original contract. The important change in the work brought about by the changed drawings was the relocation of the kitchen. This relocation, together with changes incidental thereto, accounted for $9,000 of the increased cost. Other extras were a dumb waiter, a platform lift, additional electrical work, and more expensive material for the toilets. On April 20, 1933, the contractor commenced work under the revised or substituted plans.

The bond in suit had been procured through Thomas McGee & Sons, general agents of the surety, and was executed by a Mr. Eisenman, head of the general agents' bond department and attorney in fact for the surety. About May 22, 1933, Eisenman was notified by the contractor of the changes in the drawings and in the contract price. Thereupon he sent the contractor an invoice calling for an additional premium on the bond of $152.45, accompanied by the following letter:

"Thomas McGee & Sons
"Insurance and Surety Bonds
"Third Floor
"Title and Trust Bldg. 10th and Walnut St.
"Kansas City, Mo.
"May 22nd, 1933.

"Mr. John T. Peck,
"c/o Peek Construction Co.
"404 Victor Bldg.
"City.

"Re: Contract Bond—John T. Peck, doing business as Peek Construction Company to John R. Thompson Company $15,000.00—guaranteeing completion of contract for remodeling of storeroom at 15 West 12th St., Kansas City, Missouri.

"Dear Sir:

"Referring to the additional premium of $152.45 charged under this bond, wish to advise that a premium charge on a contract bond is always figured on the estimated contract price subject to adjustment at the completion of the work on the actual amount paid to the contractor. This premium charge applies in connection with all contract bonds unless the amount of the contract bond is less than 20% of the contract price.

"In view of the fact that there was a radical change under this contract with regard to the amount of work to be done and very considerable increase in the contract price, we have billed you for this additional premium at this time instead of waiting until the job was completed; therefore, the reason for this premium charge.

"We further wish to advise that under the contract bond it is provided that alterations may be made in the terms of the contract, or the work to be done under it, or the giving by the owner of any extension of time for the performance of the contract, and the doing of these things shall not in any way release the principal and the surety or sureties, or either of them under the bond, and notice to the surety or sureties of any such alteration, extension or forbearance is waived. Therefore, the surety company is entitled to this

additional premium under the conditions of the contract and the bond, and on the completion of the work there will be an adjustment of premium according to the actual total amount received by you for the work done under this contract, and as before stated, this additional charge is made at this time because of the very radical changes in the contract and bond and the large increase in work to be done.

"Yours very truly,

"Thomas McGee & Sons

"By: E. F. Eisenman.

"EFE:MB

"Enc."

The contractor received the letter and invoice in due course of the mail, and forwarded it to the plaintiff's architect. The architect in turn forwarded it to the plaintiff, and it was received by the latter on or about May 25, 1933. On June 8, 1933, counsel for the surety notified counsel for the plaintiff that, in his opinion, the bond was ineffective because of "radical changes made in the contract." By that time the contractor was in financial difficulties. The plaintiff, through its construction superintendent, for a time supervised payments due from the contractor to subcontractors and laborers, but on June 27, 1933, due to the failure of the contractor to approve the pay roll for the week of June 22d, a strike was called and work ceased. On July 3, 1933, the surety denied liability on the bond.

On July 11, 1933, the plaintiff, as authorized by the contract, took over the work and completed it on August 10, 1933, and then brought this action against the surety to recover all cost and damage resulting from the contractor's default and all expenditures made by it (the plaintiff) in completing the work in excess of the contract price.

The surety in its answer asserted nonliability, because of the changes made in the contract on April 20th. The plaintiff in its reply alleged that these changes were not of a character which would release the surety, and that, in any event, the surety had waived any right of release.

Upon the trial, at the close of the evidence, both sides moved for a directed verdict. The trial court discharged the jury, found in favor of the plaintiff, and assessed its damages at $9,568.53. From the judgment entered upon the findings, the surety has appealed.

The questions presented are, broadly, these:

1. Was the surety liable on its bond after the substitution of the new drawings and specifications?

2. If it was liable, has the court included in the judgment items of damage and expense not properly allowable?

In considering these questions, it is important to keep in mind that this is an action upon the bond, and not upon the construction contract; that the surety was a compensated surety; that the bond therefore was in effect a contract of insurance in which the surety was the insurer and the plaintiff the insured, and that the rules of construction relating to policies of insurance are applicable to such a bond. Atlantic Trust & Deposit Co. v. Town of Laurinburg (C.C.A.4) 163 F. 690, 695, 696; City of Topeka v. Federal Union Surety Co. (C.C.A.8) 213 F. 958, 962; Hartford Accident & Indemnity Co. v. Federal Bond & Mortgage Co. (C.C.A.8) 59 F.(2d) 950, 954; Maryland Casualty Co. v. Dunlap (C.C.A.1) 68 F.(2d) 289, 291; Southern Surety Co. v. People's State Bank of South Carolina (C.C.A.4) 47 F.(2d) 93, 94; Chapman v. Hoage, 296 U.S. 526, 531, 56 S.Ct. 333, 335, 80 L.Ed. 370. See annotations in 77 A.L.R. 42, and 33 L.R.A.(N.S.) 513.

Where the terms of a contract of insurance are of doubtful meaning, that construction most favorable to the insured will be adopted. Royal Insurance Co. v. Martin, 192 U.S. 149, 162, 24 S.Ct. 247, 48 L.Ed. 385; Travellers' Insurance Co. v. McConkey, 127 U.S. 661, 666, 8 S.Ct. 1360, 32 L.Ed. 308; Mutual Life Ins. Co. v. Hurni Packing Co., 263 U.S. 167, 174, 44 S.Ct. 90, 68 L.Ed. 235, 31 A.L.R. 102; Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311, 322, 48 S.Ct. 512, 515, 72 L.Ed. 895; Aschenbrenner v. United States Fidelity & Guaranty Co., 292 U.S. 80, 84, 85, 54 S.Ct. 590, 592, 78 L.Ed. 1137; Day v. Equitable Life Assurance Soc. (C.C.A.10) 83 F.(2d) 147, 149.

"Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense." Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492, 52 S.Ct. 230, 231, 76 L.Ed. 416. See, also, Inter-Southern Life Ins. Co. v. Zerrell (C.C.A.8) 58

F.(2d) 135, 137; Davies v. Hartford Fire Ins. Co. (C.C.A.8) 75 F.(2d) 442, 443.

■ Unless the words of such a contract are obviously intended to be used in their technical sense, they will be given the meaning that common speech imports. Aschenbrenner v. United States Fidelity & Guaranty Co., 292 U.S. 80, 84, 54 S.Ct. 590, 592, 78 L.Ed. 1137; Barkerding v. Aetna Life Ins. Co. (C.C.A.5) 82 F.(2d) 358, 359; Day v. Equitable Life Assur. Soc. (C.C.A.10) 83 F.(2d) 147, 149, 150.

By the express terms of the bond in suit, no alterations in the terms of the construction contract, no alterations in the work to be done under it, no extension of time for the performance of the contract, and no other forbearance on the part of either party to the other, are to release the principal or the surety. This, we think, is the clear import of the language used.

The question then is not whether the contractor under the terms of the contract could have been compelled to perform the work as altered by the new drawings, but whether the principal and the surety upon the bond were released by reason of the changes in the contract and in the work which were agreed to by the contractor and the plaintiff. If this were a bond conditioned merely for the faithful performance of a contract, and making no mention of alterations, an entirely different question would be presented.

■ It is well settled law that, even though a construction contract provides that alterations may be made during the progress of the work, radical or revolutionary changes—changes not fairly within the contemplation of the parties at the time the contract was made—changes constituting a material departure from the original undertaking—do not come within its terms and will therefore release a nonconsenting surety upon the usual performance bond. Equitable Surety Co. v. U. S., to Use of McMillan & Son, 234 U.S. 448, 457, 34 S.Ct. 803, 58 L.Ed. 1394; United States v. Freel, 186 U.S. 309, 22 S.Ct. 875, 46 L.Ed. 1177; Maryland Casualty Co. v. Moore (C.C.A.1) 82 F.(2d) 189; Doyle v. Faust, 187 Mich. 108, 153 N.W. 725, 728, 729; Salt Lake City v. Smith (C.C.A.8) 104 F. 457; Henderson Bridge Co. v. McGrath, 134 U.S. 260, 272, 273, 10 S.Ct. 730, 33 L.Ed. 934; American Bonding Co. v. United States (C.C.A.9) 167 F. 910; United States Fidelity & Guaranty Co. v. United States, to Use of Smoot, 54 App.D. C. 342, 298 F. 365, 368; Bench Canal Drainage Dist. v. Maryland Casualty Co. (C.C.A.8) 278 F. 67, 80; Lamson v. Maryland Casualty Co., 196 Iowa, 1185, 194 N.W. 70; O'Rourke v. Burke, 44 Neb. 821, 63 N. W. 17.

■ It is also well settled that material changes not so extensive as to constitute a departure from the original contract—changes which are fairly within the scope of the original undertaking—changes which may reasonably be said to have been originally contemplated by the parties as permissible alterations—are covered by a construction contract permitting alterations, and the making of such changes does not release the surety on the ordinary performance bond. United States v. Freel, 186 U.S. 309, 317, 22 S.Ct. 875, 46 L.Ed. 1177; Equitable Surety Co. v. U. S., to Use of McMillan & Son, 234 U.S. 448, 456, 457, 34 S.Ct. 803, 58 L.Ed. 1394; Getchell & Martin Lumber & Mfg. Co. v. National Surety Co., 124 Iowa, 617, 100 N.W. 556; United States v. Walsh (C.C.A.2) 115 F. 697, 704, 705; Doyle v. Faust, 187 Mich. 108, 153 N.W. 725, 728, 729; Bartlett & Kling v. Illinois Surety Co., 142 Iowa, 538, 119 N.W. 729, 733, 734; O'Rourke v. Burke, 44 Neb. 821, 63 N.W. 17; Kretschmar v. Gross, 108 Wis. 396, 84 N.W. 429.

■ We are of the opinion that, under the terms of the bond in suit, no change in the contract or in the work to be done under it, not equivalent to an abandonment of the original contract and the substitution of a new one in its place, would operate to discharge the surety. The fact that such changes as were made in the contract and in the work were brought about by the cancellation of the original drawings and the substitution of new ones, we do not regard as important. It is what was done, and not how it was done, that is controlling. The contract, except for the substitution of the new drawings, was left intact. The work, except for the alterations made by the new drawings, was the same work, to be done for the same purpose, and upon the same premises. The changes materially increased the cost of the work, but the additional risk to the surety, if any, could be offset by an additional premium charge, as is clearly demonstrated by the letter of Mr. Eisenman.

Our conclusion is that, under the express language of this bond, the surety

was not released, by reason of the changes in the contract and the work, from its liability to the plaintiff.

In view of that conclusion, it would serve no useful purpose to consider whether the letter of Mr. Eisenman constituted a waiver. That letter is of interest, however, as showing the construction placed upon this bond by the practical insurance man who executed it.

Turning now to the question of damages. The total amount found to be due to the plaintiff from the surety is made up of various items. There is one contention made by the surety which applies to all items representing expenditures made by the plaintiff in completing the contract, namely, that while the plaintiff's evidence shows that these expenditures were made, it does not show that the expenditures were necessary or prudent.

Under the terms of this bond, the plaintiff is entitled to all cost and damage suffered by reason of the failure of the contractor to perform the contract, and to reimbursement for "all outlay and expense which the Owner [plaintiff] may incur in making good any such default." Does that language mean that the plaintiff is limited in its recovery to so much of the amount actually expended by it in completing the work (over and above what it would have expended had the contract been faithfully performed) as a court or jury might regard as reasonable and necessary, or does it mean that it is entitled to be reimbursed on the basis of what it in good faith paid out in completing the work?

We have found but one case directly in point, that of Baer v. Sleicher (C.C.A.6) 153 F. 129, 132. We quote so much of the opinion as is pertinent:

"Having thus disposed of the question of jurisdiction, the case, so far as it is necessary for us to consider it, turns upon the proper contruction of that portion of the contract which defines the limits of recovery to one who rightfully cancels the contract, and under its terms completes the job. Under the present contract, he was clearly entitled, in addition to certain damages, to the cost of completing the work. This did not mean the reasonable, but actual, cost. If it appeared from the testimony that he paid in good faith certain sums of money for material and labor to complete the job, he was entitled to recover such sums, whether the jury thought they were reasonable or not.

"The contract provided:

"'It is further understood and agreed that in case of failure of the party of the first part, the West Side Foundry Company, to complete this contract as specified and agreed upon, that the said party of the second part, Randolph & Baer, shall have the right to recover any and all damages incurred by reason of said failure by the party of the first part, and shall also have the right to recover whatever sums may be expended by the party of the second part in completing the said contract in excess of the price stipulated, to be paid by the party of the first part for completing the same.'

"Referring to this portion of the contract, the court charged the jury as follows:

"'Now, gentlemen, if, under these instructions, you find that the plaintiff was entitled to cancel this contract on the 12th day of December, you will proceed to inquire what, under the proof, he is entitled to recover from the defendants. I cannot be of much service to you in that respect. If he is entitled to recover, he is entitled to recover the reasonable cost of completing the contract, not the unreasonable or extravagant cost, but only the reasonable cost of it.'

"This portion of the charge was specially excepted to. Under it, as appears from the record, testimony was relied upon tending to lead the jury to believe that certain items charged against the defendants for the cost of completing the work were unreasonable and extravagant, and should be rejected or reduced, although paid by the plaintiff in good faith. Thus it was left to the jury to determine, as to each particular item, whether the cost should be recovered or not; in other words, no matter if the item cost what Baer charged for it, and no matter if he had paid the price thus demanded, and no matter if he could not have obtained the material or labor for less money, nevertheless, if the jury, in its discretion, should determine that the cost of the material or labor was extravagant, it might reject or reduce the item.

"We do not understand that the contract vests any such power in the jury, or leaves the contracting party to such a doubtful and uncertain remedy under the

contract. A man who contracts to do certain work must perform his contract, and, if he fails to do so and leaves the contract uncompleted, the other party is given the right to cancel the contract and complete the work. In case the contract is thus annulled, 'the party of the second part (meaning in this instance Baer), shall be thereupon authorized, if an immediate performance of the work or delivery of the materials in their opinion is required by the public exigency to proceed to provide for the same by open purchase or contract, and the party of the first part shall remain liable to the party of the second part for the damages occasioned to them by the said noncompliance, delay, or negligence.'

"We have already referred to that part of the contract which provides:

" 'That in case of failure of the party of the first part to complete this contract * * * that the party of the second part shall have the right to recover any and all damages incurred by reason of said failure, * * * and shall also have the right to recover whatever sums may be expended by the party of the second part in completing said contract in excess of the price stipulated to be paid to the party of the first part for completing the same.'

"The view we take is that the purchase of the material and labor is left to the party of the first part. It may be made either 'by open purchase or contract.' If it is made in good faith, the sums thus expended to complete the work become a proper charge against the party of the second part. The sole question is whether such sums have been expended in good faith by the party of the second part in completing the work. If they have been, it is not for the jury to say that they are unreasonable or extravagant. The party of the first part in completing the work, occupied substantially the position of an agent for the party of the second part, and did not guaranty the wisdom of the purchase of labor or material."

To the same general effect, however, is Prudence Co. v. Fidelity & Deposit Co., 297 U.S. 198, 56 S.Ct. 387, 80 L.Ed. 581, where the bond in suit provided that in case of default on the part of a borrower who was to erect a building, the lender might go forward with the work and charge the cost to the surety. The Supreme Court said (297 U.S. 198, at page 206, 56 S.Ct. 387, 389, 80 L.Ed. 581): "To show the loss sustained from finishing the work, it proved the actual cost, as by the express provisions of the bond it was at liberty to do."

We hold that, under the terms of the bond with which we are concerned, the plaintiff was not required to show that expenditures made by it in good faith in completing the contract were reasonably, necessarily, prudently, or wisely made. The question is: Did the plaintiff actually make these expenditures in completing the contract after default by the contractor, and were they made in good faith?

From what we have said, it is apparent that the trial court did not err in finding for the plaintiff, since the evidence clearly shows that the plaintiff expended more in completing the remodeling of the building than it would have expended had the contract been performed. The surety, however, challenges many of the items of damage and expense allowed and included by the court in the total amount found to be due the plaintiff. We shall discuss only those items which we think it is necessary to consider.

■■■■ The court allowed $2,000 as damages for delay. As already pointed out, the contractor, by the terms of the contract, was to have sixty working days to complete the work. The work was commenced December 18, 1932, and was substantially suspended during the period from December 29, 1932, to April 20, 1933, due to no fault of the contractor. While it appears that some work was done during the time that work was suspended to permit the plaintiff to change its drawings, the record does not show how many working days, if any, were actually put in by the contractor during that period. The contractor did not have the changed drawings until April 20, 1933. Whether all of the work done prior to December 29, 1932, was work done in the performance of the contract as eventually altered, is not clear from the record. It is clear that the contractor was entitled to enough additional time to compensate for the time lost between December 29, 1932, and April 20, 1933. McGowan v. American Tan Bark Co., 121 U.S. 575, 600, 601, 7 S.Ct. 1315, 30 L.Ed. 1027; Morse Dry Dock & Repair Co. v. Seaboard Transp. Co. (C.C.A.2) 161 F. 99, 101. It is conceivable that the contractor may also have been entitled to additional time to

compensate for time spent during the period between December 18, 1932, and December 29, 1932, in doing work originally required but not called for by the changed drawings of April 20, 1933, or which had to be altered because of such changes. The burden was upon the plaintiff to show how much of the delay, if any, in the completion of the work was attributable to the fault of the contractor, and how many working days the contractor used, prior to default, in performing work required by the contract as ultimately amended. The court found that "construction of the alterations was required to be completed on or before June 10, 1933." We think this finding is not supported by substantial evidence. Apparently there were not more than nine working days from December 18, 1932, to December 29, 1932 (excluding December 29, Sundays and holidays, and counting Saturdays as full days), and not more than forty-four working days from April 20, 1933, to June 10, 1933 (counting June 10, and excluding Sundays and holidays, and counting Saturdays as full days), making a total of fifty-four working days. Under the evidence, a finding that the contractor used the equivalent of six working days during the period when the plans were being changed, is, we think, pure speculation. It is true that the plaintiff's architect, over the objection of the surety, was permitted to testify that the job should have been completed not later than June 10th; but that opinion, even if admissible, was not the equivalent of proof that sixty working days were actually consumed by the contractor in the furtherance of the work required by the changed drawings up to June 10th.

We are not able to determine from the record when the "sixty working days" expired, nor are we able to determine the amount of plaintiff's damages due to delay. We think that the measure of damages for whatever delay was attributable to the contractor was the reasonable rental value of the premises for the period of delay. Whether the rental paid by the plaintiff under its lease was substantial evidence of such rental value we do not stop to determine, since upon a new trial reasonable rental value can be established in the conventional way. See Prudence Co. v. Fidelity & Deposit Co., 297 U.S. 198, 207, 56 S.Ct. 387, 389, 80 L.Ed. 581. The other expense items allowed by the trial court and found by it to constitute actual expenditures made by the plaintiff in the completion of the work or expenditures for which the plaintiff is entitled to be reimbursed because of the default of the contractor (with the exception of the amount expended by the plaintiff for photographs of the work as it was at the time of the contractor's default, which we do not regard as a cost, damage, outlay or expense within the contemplation of the parties to the bond) appear to be sustained by the evidence. Upon a new trial, some of them may be worthy of careful re-examination for the purpose of making certain that they contain no expenditures incurred by the plaintiff prior to any default by the contractor, for changed drawings, construction supervision, and the like.

No useful purpose would be served by relitigating the issue of the surety's liability upon the bond. That issue is settled. The question of the amount of the surety's liability is the only question requiring redetermination. May Department Stores Co. v. Bell (C.C.A.8) 61 F. (2d) 830, 843.

Since the appellant has included in its brief its entire assignment of errors and has argued all or substantially all of the errors assigned, we think it would not be possible to affirm the judgment or to dismiss the appeal for noncompliance with our rule 14, paragraph fourth of subdivision 2, as the appellee suggests.

The judgment in so far as it constitutes a determination that the surety is liable to the plaintiff upon the bond in suit is affirmed. In so far as the judgment constitutes a determination of the amount for which the surety is liable, it is reversed. The case is remanded, with directions to set aside the findings in so far as they relate to the amount of the surety's liability, and to grant the surety a new trial as to that issue.

On Motion to Modify Opinion.

PER CURIAM.

The question presented by the motion of appellee to modify the opinion in this case is whether the new trial ordered shall cover damages generally or shall be restricted to the two items of damages (damages for delay and cost of photographs) which we held were erroneously allowed. These two items have no apparent relation to other items of damages included in the judgment appealed from.

The appellee in effect contends that it should not be put to the trouble and expense of retrying any issues properly settled on the first trial, and that as to all such issues the appellant has had its day in court.

This court has the power to confine the issues to be retried to the two items erroneously allowed. Thorpe v. National City Bank of Tampa (C.C.A.5) 274 F. 200; Gasoline Products Co., Inc., v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188; City of Orlando v. Murphy (C.C.A.5) 84 F.(2d) 531, 536; May Department Stores Co. v. Bell (C.C.A.8) 61 F.(2d) 830, 842, 843. In the case last cited, we quoted, with approval, from Simmons v. Fish, 210 Mass. 563, 568, 97 N.E. 102, 104, Ann.Cas.1912D, 588, the following: "The guiding principle is that, although a verdict ought not to stand which is tainted with illegality, there ought to be but one fair trial upon any issue, and that parties ought not to be compelled to try anew a question once disposed of by a decision against which no illegality can be shown."

We have pointed out no illegality with respect to any items of damages except the two items mentioned. This is a law action, and this court may not itself retry, nor should it compel the court below to retry, issues of fact which were lawfully settled by that court, even though we might prefer that such issues or some of them be re-examined. Were it not for the two items of damages as to which error has been pointed out in the opinion, the judgment would be affirmed. We have reached the conclusion that the appellant is entitled to a new trial only as to the two items of damages as to which error was shown.

The final paragraph of the opinion in this case is amended to read as follows:

The judgment is *affirmed* except in so far as it constitutes a determination that the amount of the liability of the surety to the plaintiff includes the item of $2,000 damages for delay, and the item of $17.50, the cost of photographs. It is *reversed* in so far as it includes these two items in the total amount of damages. The case is remanded, with directions to set aside those findings upon which the inclusion in the judgment of these two items is based, and to grant a new trial as to the amount of the liability (if any) of the surety for such items.